IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>SOUTHERN DIVISION</u>

| | |
|---|---|
| RETHA WEBB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 02-PWG-2980-S |
| | ) |
| UNUM LIFE INSURANCE COMPANY | ) |
| OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

<u>MEMORANDUM OF DECISION</u>

Retha Webb, plaintiff in the above-captioned civil action, initiated this litigation with a complaint filed in the United States District Court for the Northern District of Alabama pursuant to the provisions of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., contending that she had been wrongfully denied long term disability benefits under a long term group insurance policy issued to her employer, Georgetown College for Georgetown University in Washington, D.C. (Doc. #1). The policy written by UNUM Life Insurance Company of America (Policy No. 105635 001) became effective August 1, 1995 in the District of Columbia. (doc. #1, exhibit 1).

Defendant UNUM filed a motion in which it requested that the case be "tried on briefs." (Doc. #8). Upon learning that the plaintiff also agreed to that process, the court directed that the administrative record be submitted jointly. (Doc. #9). The matter is before the undersigned magistrate judge pursuant to the provisions of 28 U.S.C. § 636(c), the parties having consented to dispositive jurisdiction. (Doc. #10). The plaintiff has submitted a brief and a calculation of damages. (Doc. #16, exhibit 2, brief in support of plaintiff's claim). The Administrative Record is before the court. (Doc. #17). The defendant's trial brief is also a matter of record. (Doc. #18).

The submission of the Administrative Record and accompanying briefs in a non-jury trial differs from a motion for summary judgment pursuant to the provisions of Rule 56.  In the Rule 56 context, if the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.  *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  Summary judgment is inappropriate even when the parties agree on the basic facts, but disagree about the inferences that should be drawn from those facts.  *Lighting Fixtures & Electric Supply Co. v. Continental Insurance Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969).  In a non-jury case such as this, the court is entitled to draw inferences from the undisputed facts in consideration of the evidence in the case as a matter of law when as here, the parties agree that a trial on the merits with live testimony would produce no additional useful information.  *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1233-24 (5th Cir. 1978).  See also *Barchus v. Hartford Life and Accident Insurance* Co., 320 F. Supp. 2d 1266, 1270 n.9 (M.D. Fla. 2004) and *Hawkins v. Article Slope Regional Corporation*, 344 F. Supp. 2d 1331, 1334 n.5 (M.D. Fla. 2002).

## OPERATIVE FACTS

It is undisputed that Ms. Retha Webb was employed as an administrative assistant in the cardiology department of Georgetown University from July 1990 until December 22, 1995.  (Doc. #16).  At the time Ms. Webb left the University she was 43 years old.  (Doc. #17, Vol. 3 of 4, UACL 00-588).  On August 1, 1995 Ms. Webb had visited the offices of Daniel Clauw, M.D., a specialist in rheumatology.[1/]  (Vol. 4 of 4, doc. #17, UACL00-774).  Dr. Clauw reported Ms. Webb's

---

[1/]     Although this was the first visit of Ms. Webb to Dr. Clauw she had "long standing symptoms of fibromyalgia, confirmed hepatitis-C which was treated with Interferon and [   ] had a number of laboratory studies suggestive of auto-immunity, with a question of systemic lupus or undifferentiated connective tissue disease having been raised in past."  Dr. Clauw assumed Ms. Webb's care after the retirement of Dr. Tony Sliwinski.  (Doc. #17, Vol. 4 of 4, UACL00851).

symptoms as "diffuse pain, fatigue, cognitive dysfunction, [and] depression." *Id*. Objectively he determined only that Ms. Webb experienced spinal muscle spasms.

In her April 30, 1996 application for long term benefits, Ms. Webb stated that she had seen Dr. Clauw in January 1996 and August of 1995.[2/]  She identified her condition and symptoms as: "fibromyalgia flare-up; muscular & joint pain & sore throat.  Stiffness; headaches; weakness, sleep difficulties, fatigue, some intestinal [   ] [sic], exhaustion."  (Doc. #17, Vol. 4 of 4, UACL00776). In her application Ms. Webb noted that she had left work on December 22, 1995 and expected to return to work "when health improves & symptoms subside."  *Id*.   In a May 6, 1996 physician's statement pursuant to a long term disability claim Dr. Clauw concluded that "at present [Ms. Webb] is unable to perform even sedentary work."  He stated that she should be restricted from "sit[ting] or stand[ing] for more than 30 minutes, stoop[ing], lift[ing] more than 10 pounds."  He concluded that Ms. Webb could not lift more than 20 pounds, squat, walk greater than two blocks or perform tasks using short term memory.  As a prognosis Dr. Clauw stated that the prospect of recovery was "indeterminate."  He did observe that Ms. Webb had not achieved maximum medical improvement and that he expected any change in her condition to take more than six months.  *Id*.

In June UNUM approved Ms. Webb's claim for long term disability benefits.  (UACL00890). In a June 19, 1996 letter UNUM informed Ms. Webb that

> UNUM will request that you provide us with periodic medical evidence and vocational information to support your claim for continued disability benefits.
>
> . . .
>
> The contract under which you are insured contains a provision that may allow you partial benefits if you return to work.  Should you find

---

[2/]        Ms. Webb received short term disability payments prior to the long term care application.

that you may return to work part-time or at a loss of earnings, the enclosed brochure explains how your benefits will be calculated.

. . .

Our experience with disability claims has shown that many people are capable of resuming work activities within a short period of time after becoming disabled. We will continue to closely monitor your medical condition with periodic updates so that when return to work becomes a possibility, you will be aware of the return to work provisions in your policy.

(Vol. 4 of 4, UACL00890-00889).

As more fully set forth below Ms. Webb received disability payments for a period of more than 40 months although she demonstrated considerable difficulty in submitting complete follow-up medical information in a timely fashion. Finally, on December 21, 1999 UNUM wrote Ms. Webb to inform her that because of a continued failure to provide proof of her disability

... within the specified time period, [UNUM] [was] closing your file in accordance with the following provisions:

your proof of claim, provided at your expense, must show:

– that you are under the regular care of a doctor;
– the appropriate documentation of your monthly earnings;
-- the date your disability began;
-- the cause of your disability;
-- the extent of your diability, including restrictions and limitations preventing you from performing your regular occupation; and
-- the name and address of any hospital or institutional where you received treatment, including all attending doctors.

... If you are still interested in pursuing your claim for disability benefits, please provide us with the necessary information immediately to support your claim for benefits.

> If you do not agree with our decision, you may have it reviewed.
> Should you desire a review, you must send a written request....

(Doc. #17, Vol. 3 of 4, UACL00726-00725).

In addition to the letter informing Ms. Webb that her benefits had been suspended, her claim's specialist telephoned her to inform her of the decision. (Doc. #17, Vol. 1 of 4, UACL0028).[3] On March 17 Ms. Webb telephoned the claim's specialist to state that she had been unable to reach her attending physician [Dr. Clauw] because she had been 'too sick." ( *Id*., UACL0026). On March 20, 2000 the assistant to the claim's specialist spoke with Ms. Webb and acknowledged that some medical information had been received. (UACL0022). On March 21, 2000 the claim's specialist returned Ms. Webb's call and "let her know that the medical information came in." ( *Id*., UACL0020). On April 3, 2000 the director of customer care, Robert G. [Burt] Stone, spoke with Ms. Webb and "informed her that the medical [sic] she sent in had been reviewed by our OSP [on site physician]. Current info does not support disability. No objective findings in the medical [sic] that was sent." ( *Id*., UACL0017). By letter dated the same day a benefits technical specialist notified Ms. Webb that

> We have reviewed the additional information you recently sent us.
> We regret this information is not sufficient to reverse our previous
> decision. Specifically, there is no objective evidence to support any
> restrictions or limitations that would prevent you from returning the
> work.

---

[3] **12.21.99**; I called Retha to let her know I was clsoing [sic] her claim due to failure to provide proof. She said she was suppose to see Dr. Claws (sp) the other day but her parasitic disease is in a molting phase. She doesn't want to go into the facility in this state because it is highly contagious. She asked if I knew anybody at UNUM who specializes in infectious disease. It maybe helpful to discuss her claim with them because there are many people with diseases like hers, i.e., CFS, fibro and parasitic infections. She is wondering if the Hood Worm came from China or the Middle East because China doesn't have there [sic] food checked by the FDA. On 3 different occasions she had plane tickets to go home to see her family but she was unable to do so because she was in a molting phase of her infection. I told her to forward the information from the doctor and I would review it. She asked if she was going to get a December check. I told her no because her benefits were suspended for failure to send the requested information and then we subsequently closed it.... Brenden

> Therefore, this information and your file and been forwarded to the Quality Review Unit in Portland, Maine.  They will provide an impartial review as provided by ERISA.  The quality review unit will contact you when your file is received, to explain the appeal process and let you know who will be handling your appeal.

(UACL0016).

On April 14, 2000 an "appeals consultant" wrote Ms. Webb acknowledging the receipt of a letter requesting a review of the long term disability claim.  (UACL0015).  On April 28 the appeals consultant wrote Ms. Webb to state:

> We have completed our review regarding the denial of benefits on your long term disability claim.
>
> We wish to inform you that based on our review of the file, we have determined that the decision of April 3, 2000 was not appropriate. (Emphasis added).  Your file has been returned to a representative in our Portland, Maine location.  This office will continue the investigation of your claim until an appropriate determination of liability can be made.  All further correspondence should be directed to this office.  We are pleased that we had the opportunity to review your claim.[4]

(UACL0013).

In May of 2000, UNUM undertook the process of evaluating the claim for continued long term medical benefits.  During this period Ms. Webb frequently telephoned the company.  On May 26, 2000 the claims specialist telephoned Ms. Webb to inform her that the decision had been made to "uphold the denial of her claim." (Id., UACL006).  By letter dated May 30 the May 26 conversation was confirmed.  The letter specifically identified a Functional Capacities Evaluation (FCE) conducted on July 22, 1999 as a basis for concluding Ms. Webb was not eligible for continued long

---

[4] Apparently this reference to "not appropriate" was made to the conflating of a "closing" of the file for non-compliance reasons with an inchoate finding that the new material information did not support continued eligibility for benefits.

6

term disability benefits.  ( *Id*., UACL005).  The letter also referred to the plan requirement that she provide updated medical documentation.  *Id*.[5/]  On September 21, 2000 UNUM acknowledge that Ms. Webb had requested an additional review of the long term disability claim.  The company noted the receipt of additional information and informed Ms. Webb that within "60 days" it would determine whether to change the original decision.  (*Id*., UACL001).  In October 2000 Daniel Clauw, M.D., Niveditha Mchan, M.D., and Kim Groner,  M.S.N. wrote to UNUM confirming that Ms. Webb continued to suffer from fibromyalgia, "... an illness characterized by chronic, generalized pain and fatigue."  (Doc. #17, Vol. 2 of 4, UACL00464).  The letter specifically noted that "... there are no formal laboratory tests or x-rays that may be used to diagnose fibromyalgia.  This diagnosis is based on a careful history and physical exam and the review of laboratory data that may 'rule out' other potential causes for pain and fatigue."  *Id*.  Significantly, the letter concluded that "... we suggest continued disability of Ms. Webb for the diagnosis fibromyalgia.  We understand that UNUM has paid for 24 months of disability for the diagnosis of depression in the past.  We based the opinion on extensive clinical and research experience with over 2000 patients and publications in this area."  *Id*.  Dr. Clauw signed the letter as the Chief, of the Division of Rheumatology, Dr. Mchan signed as an instructor of Rheumatology and Ms. Groner as an Adult Nurse Practitioner in the Division of Rheumatology.

In January 2001 UNUM informed Ms. Webb that after a review by a "vocational consultant" and Francis A. Bellino, M.D., the Vice-President and Medical Director of UNUM, the company

---

[5/]    The letter referred to an earlier inquiry made by Ms. Webb questioning whether her psychiatric condition has also been taken into account in determining her disability status.  The denial letter of May 30, 2000 noted that psychiatric benefits were available only for a term of 24 months and that at the time of termination Ms. Webb had received benefit payments for a term of 44 months.

stood by the denial of long term care benefits.  (Doc. #17, Vol. 2 of 4, UACL000405-00485).    It

is from this determination, not the December 1999 suspension of benefits, that this lawsuit arises.

The Plan

_____The group insurance policy providing for long term disability benefits specifically

acknowledged that

> UNUM Life Insurance Company of America (referred to as UNUM)
> will provide benefits under this policy.  UNUM makes this promise
> subject to all of this policy's provision.

(Doc. #17, Vol. 2 of 4, UACL00584).[6]   The policy recognized that it was governed by the entire

Employment Retirement Income Security Act of 1974 and subsequent amendments.   The plan

expressly provided that

> When making a benefit determination under the policy, UNUM has
> discretionary authority to determine your eligibility for benefits and
> to interpret the provisions of the policy.

( *Id*., USCL000583).

According to the policy, a claimant was to be considered disabled when:

> ...  **UNUM** determines that:
>
> --    you are **limited** from performing the **material and
>        substantial duties** of your **regular occupation** due to your
>        **sickness** or **injury**; and
>
> --    you have a 20% or more loss in your **indexed monthly
>        earnings** due to the same sickness or injury.
>
> You will continue to receive payments during beyond 60 months if
> you are also

---

[6]    UNUM has also acknowledged elsewhere that it pays long term disability benefits from its own asserts rather
than act solely as an administrator of a separate trust or fund.  (Doc. #16, p.24).

>    --    working in any occupation or continue to have a 20% or more loss in your **indexed monthly earnings** due to your sickness or injury; or
>
>    --    not working and, due to the same sickness or **injury** are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(emphasis in original) (Doc. #17, Vol. 2 of 4, UACL00568).[7] Under a section identified as a

maximum payment period UNUM provided that

>    We will stop sending your payments and your claim will end on the earliest of the following.
>
>    --    during the first 60 months of payments, when you are able to work in your regular occupation on a **part-time basis** but you choose not to; (emphasis in original)
>
>    --    after 60 months of payments, when you are able to work in any occupation on a part-time basis but your choose not to;
>
>    --    the end of the maximum period of payment;
>
>    --    the date you are not longer disabled under the terms of the plan;
>
>    --    the date your disability earnings exceed the amount allowable under the plan; or
>
>    --    the date you die.

( *Id.*, UACL00560).

---

[7]    The policy also defines regular occupation as "the occupation you are routinely performing when your disability begins."

The Plan informed potential claimants of the proof requirements to obtain relief.  The provisions stated:

>Your proof of claim must show:
>
>> --      that you are under the **regular care** of a **doctor**;
>>
>> --      the appropriate documentation of your monthly earnings;
>>
>> --      the date your disability began;
>>
>> --      the cause of your disability;
>>
>> --      the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and
>>
>> --      the name and address of any **hospital or institution** where you receive treatment including, all attending doctors.
>
>We may request that you send proof of continuing disability indicating that you are under the regular care of a doctor.  This proof must be received within 30 days of a request by us.
>
>In some cases, you will be required to give UNUM authorization to obtain additional medical and non-medical information as part of your proof of claim.

(Emphasis in original) ( *Id.*, UACL00554).

MEDICAL AND PROCEDURAL HISTORY

<u>1995</u>

When Retha Webb visited Dr. Clauw in August, 1995, he observed that the symptoms she presented were essentially those that had been described earlier to Dr. Sliwinski.  (UACL00851).[8]

---

[8]  Ms. Webb had an extensive medical history much of which was related to chronic pain.  As early as 1987 she began to appear regularly with such complaints.  Dr. Kenneth Johnson saw Ms. Webb in January 1987 and reviewed the records from her previous rheumatologist.  He concurred with the earlier finding of an

Dr. Clauw recommended that Ms. Webb re-start a prescription for Elavil and when the appropriate

dosage was reached she was to begin an aerobic exercise program.  Dr. Clauw indicated that he

would see Ms. Webb again in two to six months. ( *Id*., Rheumatology Ambulatory Services Record

dated 8-4-95).  On December 19, 1995 Ms. Webb appeared in the office of Dr. Clauw with "flu-like"

symptoms resulting in a fever, sore throat and a diffused rash on her face.  She had been away from

her work approximately two and one-half weeks at that time.  (UACL00847).


1996

On January 19, 1996 Dr. Clauw determined that he would treat Ms. Webb's fibromyalgia

more aggressively by adding a serotonin re-uptake inhibitor such as Prozac or another drug.[9/]  Dr.

Clauw wrote to another physician that with the Elavil Ms. Webb had seen some improvement in

pain, fatigue and other symptoms.  She reported that she had been fairly stable until just after New

Year when she developed a low grade fever, diarrhea, cramps, sore throat, rhinitis and a worsening

myalgias.  Dr. Clauw stated that the latest report of illness could be a "flare-up" of fibromyalgia or

some other illness such as a viral infection, autoimmune disease such as lupus.  He directed that lab

---

undifferentiated connective tissue syndrome with "fluctuant systemology ."  (Doc. #17, Vol. 4 of 4,
UACL00892-893).  In 1990 at the age of 38 she saw Dr. Sliwinski at the Georgetown University Medical
Center with complaints of "horrible fatigue."  After an examination Sliwinski concluded that "... the patient has
unequivocal fibromyalgia and a mechanical back. ... [  ] ... I would like to start her on Elavil 10 mg ... and ...
start on a walking exercise program...."  (4 of 4, UACL000902-903, physician's notes).

[9/]     Fibromyalgia generally indicates pain in the fibrous connective tissue components of muscles, tendons,
ligaments, and other "white" connective tissue. *Merck Manual of Diagnosis and Therapy* (15th Ed. 1987).  It
is a wide-spread musculoskeletal pain and fatigue disorder for which the cause is still unknown.  The pain of
fibromyalgia has no boundaries.  The disease is chronic.  Overall studies have shown that the fibromyalgia can
as disabling as rheumatoid arthritis.  Fibromyalgia Basics-Symptoms, Treatments and Research, (Google),
Fibromyalgia Network (2002).  Fibromyalgia is best classified as a syndrome, not a disease.  As William
Hennen, Ph.D. and author of Fibromyalgia: A Nutritional Approach, a disease is a condition with clearly
identifiable causes, while a syndrome is a set of symptoms that define the condition without a single causative
agent upon which to place the blame.  See *Ecklund v. Continental Casualty Company,* 415 F. Supp. 2d 1353
(N.D. Ala. 2005).

tests be performed.  (UACL00843).  In June 1996 Dr. Clauw reported to the claim's specialist at UNUM that Ms. Webb continued to need short term disability benefits.  (UACL00826).  He requested an extension of benefits for an additional six weeks.  (UACL00822).  On June 26 in response to an inquiry from UNUM, Dr. Clauw wrote that

> Neither her fibromyalgia nor depression are well enough controlled at present to allow her to work, even part-time.  I will see her again soon, and hope that by the end of the summer she will be well enough to start part-time trial employment.

(Vol. 4 of 4, UACL00812).

Like Dr. Sliwinski, Dr. Clauw ordered that Ms. Webb receive physical therapy.  The progress notes from those sessions beginning in March 1996 reflect Ms. Webb's continued complaints of pain and exhibited an inability to appear for treatment in a timely fashion.[10]

On May 10, 1996 the physical therapy progress notes reflect that Ms. Webb talked with Dr. Clauw (UACL00883).  She continued to report "very tender" muscle tissue.  On August 15, 1996 UNUM requested additional medical data from Dr. Clauw.  He was asked to explain Ms. Webb's then current restrictions and limitations, any change in those restrictions or limitations, the course of treatment, how frequently he saw her and the date of her last office visit.  Also UNUM asked whether Ms. Webb was ready to return to gainful employment "... on at least a part–time basis ...." UNUM advised Clauw that the company's policy allowed for a return to work on part-time basis

---

[10]   E.g., on April 1, 1996 the therapist noted that "pt was late (had to call her – she had forgotten)."  (Vol. 4 of 4, doc. #17, UACL00874, April 15, 1996).  Patient late.  Was confused about schedule.  Wanted a double session but hadn't called to schedule.  Late for first session, second session we did full."  *Id.*, at 875.  April 26– "pt very late–double session."  (00877).  April 29–"pt. slightly late–double session."  *Id.*  Throughout this period Ms. Webb also presented with pain in her upper and lower back muscles, her side, hips, knees, joints and elbows and discomfort in her neck.  She reported "still feeling pain all over--"  (UACL00875, progress note, April 12, 1996).  On April 29 she reported "pain all over today – on a scale of one to ten she says this is a "12."  Hands and feet very sore."  (UACL 00877).

while Ms. Webb would continue to receive benefits.  The company sought a new prognosis for her

return for work if she was not able to work immediately.  (Doc. #17, 4 of 4, UACL00957).  The

company also asked for medical records:

> **In addition to answering above questions, please forward copies of all office notes, test results and consultive reports since May 1996, and if a Functional Capacity form is enclosed, please fully complete and return to our office.**

(*Id*., bold in original.)

Dr. Clauw responded by letter on August 27, 1996 in which he stated:

> I am responding to your letter of August 15 regarding Retha Webb. I feel that Ms. Webb remains totally disabled by her fibromyalgia. She has slightly improved since she went on disability, but this improvement has been mild and has not led to any substantive change in her ability to work.  I see her approximately every two months, she is on a number of different medications to treat both her fibromyalgia and her concurrent depression.  In addition, she has begun a number of other types of treatment modalities involving nutrition, physical therapy, and chiropractic manipulation in an attempt to get better improvement of her systems.
>
> I do not feel that she could return to part-time work at present, not only because she is incapable but also because she is making slow steady progress and I feel that this will be detrimental to her long-term ability to return to work.

(UACL00958).

In October 1996 UNUM requested Christina McGonagle to visit the claimant.  The reason

for the referral was noted on a UNUM memorandum: as

> This is a claim for a 34 y/o TD as of 1/02/96.  I have enclosed file summary for your review as well as an 8/96 NARR.  Please do a standard PC with the CLMT.  Put emphasis on her future RTW (return to work) plans, current px and her daily activities.  If claimant is interested in RTW than [sic] explain our rehab services.  Please FU on SSBI status.  Of this date no info that she applied.  I sent letter

> today.  Due [sic] suspect clam'ts' condition is not a [sic] severe as
> indicated by the medical.

(UACL00962).

It appears that Ms. Webb cancelled appointments with Ms. McGonagle on at least two occasions

prior to meeting with her.  (UACL00964).

<u>1997</u>

McGonagle submitted a report to UNUM on January 7, 1997 referring to a January 2, 1997

visit.[11] In her report Ms. McGonagle states that during the interview

> The claimant sat comfortably in a straight-back chair during the hour
> long interview and did not complain of any or discomfort.  She did
> not appear to be in pain and appeared to sit, stand and walk normally
> without any obvious signs of discomfort or pain.
>
> . . .
>
> She did speak at great length and seemed to evade answering direct
> questions.  I had to reiterate numerous questions because she did not
> answer the questions and would invariably speak about her illness or
> her family, etc.
>
> . . .
>
> The plaintiff has current medical problems:
>
> 1.     Fibromyalgia
>
> She complains of global and random pain in places that don't
> ordinarily hurt.  She fatigues very easily and states that she needs to
> resume physical therapy as the insurance is reinstated.  She was able
> to walk a city block while in physical therapy, but, found that she had
> to stop and rest before she could complete the return portion of the
> trip.  She complains of difficulty concentrating and remembering

---

[11]     Ms. Webb called UNUM to complain that McGonagle had "failed to present complete information."

things and was afraid that she might be getting Althzeimers; however, she was told this was part of fibromyalgia.

On a scale of 1-10 (10 being worse), her pain is a 7.5 or 8 on a good day and on a bad day, the pain is "like a 90." Since leaving work, she feels this condition is worse although she hates to admit this.

. . .

The claimant also indicates she has been treated for depression in the past. She believes this occurred when she first went to work for Georgetown and was treated by Dr. Roberta Gilbert who is currently on the faculty at Georgetown University. The claimant does not have Dr. Gilbert's current address. She also mentions that she was being treated by a rheumatologist during this period also.

. . .

POINTS OF FACT

1. The claimant has been difficult to schedule an appointment with. She has not been available by phone and deliberately prolonged a stay in Alabama knowing that she would miss the December appointment.[12/]

2. The claimant indicates she has received previous psychiatric care at the time of employment. She says that she was also seeing a rheumatologist at that time.

3. The claimant, who is 44, makes repeated references to "needing my mommy."

4. The claimant is taking a number of anti-depressants in relatively high doses.

5. The claimant indicates that has [sic] cognitive impairments as a result of the fibromyalgia. She did communicate quite clearly during the interview and understood what was said to her. Her responses were appropriate although, she did seem to evade answering questions constantly and had to be redirected.

---

[12/]    Like many of McGonagle's "declarations" it is not explained how she reached the conclusion that Webb deliberately failed to return in order to miss the December appointment.

15

6. The claimant sat comfortably during the interview although she says she has to shift her weight every five minutes due to pain and discomfort. I did not see evidence of this.

7. The claimant's work place has been going through reorganization and downsizing and her responsibilities were expanded. She felt the stress of working for so many people for such long hours.

(Doc. #17, Vo. 4 of 4, pp. UACL00966-00972).

On January 8, 1997 UNUM renewed the request for information from Dr. Clauw. Again the insurer sought an indication of the scope of Webb's current restrictions and limitations and asked whether the restrictions prevented her from working part or full time. The questions required the doctor to state how the restrictions would affect her ability to work. UNUM sought information concerning the expectation for fundamental change in her condition as well as the current course of treatment. At question 3 UNUM inquired

What is the current course of treatment; in the past Ms. Webb was under the care of a psychologist, but it is our understanding that she has not been treated since the summer of 1996 due to insurance problems. Do you feel that she would benefit from psychological care? Are you going to encourage her to resume this treatment? If not, why not? In the past you indicated her depression was secondary to her fibromyalgia. Do you still feel this is the case?

(UACL00975).

The request for information once again asked for all office notes, test results and consultative reports after August of 1996 and also asked the physician to predict when Ms. Webb would be able to return to part-time or full-time employment. *Id*.[13]

Ms. Webb had seen Dr. Clauw on February 18, 1997. During that visit Ms. Webb informed Dr. Clauw that she had stopped all of her medications because her insurance had lapsed. Dr. Clauw

---

[13]    It does not appear that Dr. Clauw responded to the January 1997 request.

recommended restarting medication, physical therapy and counseling.  On February 25, 1997 UNUM again sought medical treatment information and a prognosis from Dr. Clauw.  (UACL00979).  On April 30, 1997 UNUM wrote Ms. Webb requesting an updated certification for continued disability benefits.  The letter requested that Clauw complete an "Attending Physician's Statement" (APS)  in May of 1997 and submit it to the company.  (UACL00993).  On June 19, 1997 the company repeated the request.  (UACL00996).  In telephone conversations with UNUM employees Ms. Webb said that she was scheduled to meet with Dr. Clauw in July and again in August.  In each case she told the company that she would have the supplemental information forms completed by the physician at that time.  She repeated her intention to produce the information in a September 1997 telephone call.  On October 16, 1997 the company wrote Ms. Webb reminding her of her obligation to provide medical information supporting her disability claim.  The company stated that if the evidence was not received within 30 days, the claim file could be closed.  (UACL00998),  The first official "Thirty Day" letter informing a participant that benefits would be discontinued was sent to Ms. Webb on November 18, 1997.  The November 18 letter stated "We are closing your file in accordance with the ... policy provision." (UACL01001).  On November 25, 1997 Dr. Clauw completed a Long Term Disability Care Physician Statement in which he stated Ms. Webb continued to suffer from pain, fatigue, memory problems, weakness and was required to take medications.  He observed that while she had received physical therapy the results had not been beneficial.  Records submitted with the statement reflected only two office visits coming in May and August 1997.

1998

On January 16, 1998, UNUM again requested additional copies of treatment notes, diagnostic tests, and consultative reports of the insured from Clauw.[14/] In March of 1998 Ms. Webb reported to UNUM that while she had tried to perform physical therapy exercises she had been unable to do so because of pain.[15/] She told the company representative that she had aches and pains everywhere and that intense pain moved around to different locations in her body. She told the representative that she did not like to take the psychotropic medication because it made her groggy. When asked what she would need to return to work she told the company that she would first have to develop an increased ability to cope with stress. (UACL01028).

In March of 1998 the UNUM claims representative wrote that "claimant is totally disabled as of 1/2/96 due to fibromyalgia, showing only slight signs of improvement. Attending physician continues to support her disability." (UACL00650). On April 30, 1998 Ms. Webb telephoned the claims representative to tell him she had been unable to see her physician and that she would provide the requested medical data when it was available. On June 1, 1998 UNUM wrote Ms. Webb noting again that she had failed to provide requested information specifically the office notes and physician's forms. (UACL00646). On the same day as the letter was sent to Ms. Webb, the claims representative talked to her. In a notation to the file the representative wrote:

> She said she still has not seen Dr. Claw [sic]. I explained I needed this info by her next check. I cannot issue another check without this info. I said that I had requested by 4/30 and gave her another month, but I can only give her 30 more days. She understood. She said she

---

[14/]     The January request was a "SECOND REQUEST." (UACL00655). A second request on the same date was sent to Ms. Webb. ((UACL00653).

[15/]     During this period UNUM life insurance company received a garnishment notice from a creditor of Ms. Webb. (UACL01012). Ms. Webb began to contact the company objecting to the interruption of her benefits because of the garnishment.

> would go and sit in his office until he saw her if the secretaries say
> they can't fit her in.

(UACL00645).

On July 17, 1998 the claims representative spoke again with Ms. Webb to inform her that the company had not received the promised supplemental form and medical office notes.  During this conversation Ms. Webb promised to fax the form.  Also noted in this July 17, 1998 memorandum is the statement that

> She said she will be able to RTW (return to work) in September and
> would be 15 to 20 hours.
>
> She wanted to discuss partial benefits and possible rehab for RTW.
>
> Please update the systems.

(UACL00644).

On July 27 the claims representative wrote to Ms. Webb stating

> Thank you for expressing an interest in your benefits and a possible
> return to work.  You should be aware of the provisions of your policy,
> as they may be financially advantageous in the event you return to
> work.  I have enclosed this information for your review.  Your policy
> contains an excellent Work Incentive Benefit which is administered
> as follows:
>
> . . . .
>
> Disability payment will be subject to terms of the policy for prior
> disability.  Your benefits will be reinstated in full without having to
> satisfy a new elimination period [if you return to work for less than
> six months].

(UACL00642-43).

On July 31, 1998 Ms. Webb spoke to a claims representative.  In this conversation she apparently reaffirmed her plan to return to work in September.  (UACL00640).

19

On August 18, 1998 the company wrote Ms. Webb a second "30-day letter" noting that Ms. Webb had promised on July 17, 1998 to fax a copy of at least a part of the required information but had failed to do so.  The company also stated that it had not received the attending physician notes from Clauw.  The letter informed Ms. Webb that if the information was not received within thirty days the company would conclude that she was no longer pursuing her disability benefits and her file would be closed.  (UACL00637).[16]   On August 21, 1998 Ms. Webb spoke with the claims representative.  A memorandum to the file stated that Ms. Webb had said that she was at that time going through an interview process at Georgetown University in an attempt to find a job with minimal customer interaction and stress.  The representative reminded Ms. Webb that the company had not received the supplemental form and that the information would be required in order for the administrator to continue paying her claim.  Ms. Webb told the representative that her fibromyalgia condition could not be cured but that she hoped "... to adapt to whatever residual problems" remained.  She told the representative that she had encountered so many personal problems in addition to the disease, including three evictions, that the stress was limiting her ability to function. She told the representative that "my doctor encouraged me [to work] and said my starting part-time and with minimal stress hopefully you can find some less...."  (UACL0037-0036, Vol.2 of 4).[17]

In a fax transmitted to the company on September 19, 1998, Ms. Webb stated that she had not been doing well and had been required to move again because of an abusive house-mate.  She stated that "I am quite dysfunctional at this point, and in extreme pain and having anxiety/panic attacks again."  (UACL00039).  Accompanying the September 19 fax was the supplemental

---

[16]     This document is repeated at UACL00031 in Vol. 2 of 4.

[17]     The notation ends as set out above.

statement of continuing disability initialed by Dr. Clauw in which he observed that he had last seen Retha Webb on June 16, 1998 when she presented with subjective symptoms of diffuse pain, fatigue, memory difficulties.  He noted her physical impairment to be "... moderate limitation of functional capability, capable of clerical/administrative (sedentary) activity ..." and described her mental or nervous impairment as "patient is unable to engage in stress situations or engage in interpersonal relations." (UACL0042).  He concluded on the form dated June 16, 1998 that Ms. Webb could return to work on a part-time basis by September 1, 1998 and recommended vocational counseling or training.  (UACL0041).[18/]   A handwritten notation by a claims representative dated 9/22/98 indicated that the "supplemental form" was received by UNUM "but not office notes" from the doctor.  (Vol. 2 of 4, UACL0034).  By telephone on September 25 the company again requested the same information directly from Dr. Clauw.  (UACL00066).[19/]

On October 29, 1998 a UNUM claims representative met with Ms. Webb at her apartment in Arlington, Virginia.[20/]   Ms. Webb told the representative, Thomas McAnany, that she had a

---

[18/]   The copy faxed to UNUM on September 18 clearly indicates that Ms. Webb authorized the release of this information on June 16, 1998 and that Dr. Clauw completed the form on June 16, 1998.  It was faxed more than two weeks after the September 1, 1998 date that Dr. Clauw had indicated Ms. Webb would have the ability to return to work.  UNUM recognized this anomaly and wrote to Dr. Clauw's office staff.  UNUM observed that the faxed copy was difficult to read and that changes had been made on the document.  Dr. Clauw's office staff have apparently indicated that they did not have a copy of the fax in the file.  The letter from UNUM also requested office records from September 1997 to September 1998 which had not been received. (UACL00063).

[19/]   On this same date the claims representative observed that Ms. Webb had continually requested that her disability checks be "overnighted to her."  She had given reasons for this special treatment in the past including that the checks had been lost, that she needed the money to take trips, that she had a dental emergency and "this month for a family emergency."  The company concluded that it would no longer overnight checks to Ms. Webb. (UACL00067).

[20/]   In October 1998, after being informed that Ms. Webb would move again, representatives of UNUM discussed conducting surveillance of her during the move.  (Memorandum dated 10/23/98; UACL0084).

December 1998 appointment with Dr. Carey of Georgetown University for cognitive testing[21].  She complained of a lack of energy and chronic pain.  She discussed significant personal problems with her landlord and her depression over the death of her younger brother.  She told the representative that she had hurt herself in an attempt to assist in moving her belongings.  When asked about returning to work, Ms. Webb told the representative that she wanted to begin to work at a part-time position in another department of Georgetown and then gradually increase her hours.  She told the representative that she hoped to return to work sometime after she had moved from her residence. (UACL00091-94).   On December 5, UNUM requested data from Dr. Meredith Carey in the psychiatric department of Georgetown University about Ms. Webb's treatment.  (UACL0096).  On December 10, 1998 the Department of Psychiatry noted that Ms. Webb had failed to show for scheduled intake appointments with Dr. Carey and the psychiatrist had never seen her. (UACL00104).

1999

On February 10, 1999 UNUM wrote Ms. Webb to inform her that the company had contracted with GENEX, identified as a "medical and vocational case management agency," for the purpose of providing medical and vocational consultation services with respect to Ms. Webb's claim. The letter informed Ms. Webb that a representative with GENEX would be in contact with her to discuss the claim.  (UACL00139).

---

[21]     The notes refer to Cleery but Ms. Webb was scheduled to see Dr. Carey.

After several unsuccessful attempts to reach Ms. Webb by telephone during January, a UNUM representative spoke with her on February 11, 1999.[22] Ms. Webb reported that she had begun to suffer from Irritable Bowel Syndrome which flared up with stress. She told the UNUM representative that she had begun physical therapy at a clinic near her house although a $300 deductible would prevent her from completing the therapy. During this conversation Ms. Webb acknowledge receiving a January 16 letter requesting supplemental doctor information and a new authorization for the release of medical records. She agreed to mail the authorization and provide a copy of her Social Security Administration application for disability benefits.[23] She told the representative that she wanted to begin computer classes and requested information about the Rehabilitation Technology Act, a program with which the UNUM representative was not familiar. Ms. Webb expressed an interest in the rehabilitation services available through UNUM. (UACL00137).

On April 16, 1999 GENEX informed UNUM that the FCE had been scheduled for April 8 and 15 and that on each occasion Ms. Webb had failed to appear. An Independent Medical Evaluation had been scheduled for May 2 and GENEX expressed concern that Ms. Webb would not appear.[24] On the same day a UNUM representative spoke with Ms. Webb who claimed that she had not received the notices concerning the appointments. She was reminded of the importance of

---

[22]    In January of 1999 Ms. Webb was in frequent contact with UNUM concerning a garnishment proceeding. She was extremely upset and concerned that UNUM would provide the plaintiff in the underlying action with information that would allow him to discover where she lived. She stated that the plaintiff in that action was "stalking her." She complained that UNUM was suppose to be her "representative" and had failed to oppose the garnishment. During this period Ms. Webb made contact with UNUM using various pay telephones.

[23]    On March 1, 1999 Ms. Webb telephoned UNUM to inform the representative that she had "just found the authorization" and that it would be mailed the next day. (UACL00151).

[24]    Ms. Webb had been notified of the evaluation dates by certified mail and by voice mail.

completing the FCE and a cognitive evaluation.  During the telephone call Ms. Webb reported that she felt she need a job with less stress than her earlier employment.  Ms. Webb agreed to contact the GENEX representative.  (UACL00207-208).  On April 30, 1999 GENEX informed UNUM that Ms. Webb had once again failed to appear for the FCE.  On April 20 Ms. Webb had spoken with GENEX and rescheduled on April 20 evaluation for April 23.  On April 23 she called GENEX to say that she would be unable to get a taxi to the examination because of a NATO conference.  On April 30 she cancelled the evaluation stating that she had "mites/jiggers and would need to see an infectious disease specialist."[25] (UACL00216).  On May 6 Ms. Webb again failed to appear.  By telephone she reported having "flu-like symptoms but that she hoped to attend the FCE and meeting with the psychiatrist the following week."  The FCE was scheduled for May 14.  She did not appear.  On May 18, 1999, Ms. Webb was reached by telephone.  She stated she was being treated for her infection and that was the reason for her failure to appear for the FCE on May 14.  (UACL00218).  On May 21 UNUM wrote to Ms. Webb once again explaining that GENEX had attempted to complete a Functional Capacity Evaluation and arrange for an Independent Medical Evaluation.  The letter observed that the last medical data the company had received was Daniel Clauw's form dated June 16, 1998 in which he stated that Ms. Webb would be capable of returning to work on a part-time basis by September 1998.  (UACL00224-225).

On June 4, 1999 Ms. Webb was scheduled for a 8:15 appointment for the FCE.  At 8:40 a.m. she telephoned the representatives of GENEX to tell them that she had been at the emergency room on two occasions the previous night.  They agreed to attempt to work her in for an evaluation during the course of the day.  Ms. Webb arrived at 10:40 a.m. but stated that she had an appointment with

---

[25]/     It was important to GENEX to complete the FCE and have a copy of the report available before the psychiatrist met with Ms. Webb to conduct a separate evaluation.

the dermatologist at 2:00 p.m. the same day.  Ms. Webb claimed that she had a "tropical parasitic infection" in her blood stream.  The FCE was rescheduled for Tuesday, June 8 at 9:00 a.m. and again cancelled.  (UACL00229-00230).  A June 14 Independent Medical Examination was postponed when on June 10 Ms. Webb reported that she continued to have "lesions."  (UACL00232).  On June 11 Ms. Webb spoke with a UNUM representative.  It was explained to Ms. Webb that in order to issue her June 1999 benefit check the company would have to have a statement from her current attending physician identifying her current problems and a narrative with respect to treatment and prognosis.  The representative again reminded Ms. Webb that the last statement from Dr. Clauw in June 1998 indicated that Ms. Webb could return to work by September 1998.  (UACL00233-4).  On June 17 and June 18 Ms. Webb was again informed of the need for a statement from her attending physician.  A new date for the FCE was set for July 9, 1999.  It was the intent of GENEX to schedule the Independent Medical Evaluation as soon thereafter as possible.  (UACL00241).  By letter dated July 1, 1999 UNUM once again notified Ms. Webb of the FCE and stressed the importance of attending these examinations.  The company told Ms. Webb that

> As you have been advised previously, failure to attend these examinations will most likely result in the termination of your disability benefits.

(UACL00242).

On July 1 Ms. Webb telephoned UNUM to report that she would be unable to attend the July 9 FCE because her daughter was moving to California and her family was gathering in Alabama.  She also reported a new flare-up of her rash and a biopsy of the lesion.  (UACL00245).  On July 14, 1999 a UNUM representative spoke with Ms. Webb concerning the FCE/IME.  The representative told Ms. Webb that the company could consider the impairments she had alleged only if there was medical

documentation of those limitations.  The representative also told Ms. Webb that if the IME/FCE revealed that she had the capacity to work even part-time, her Long Term Disability payments would end unless she was actually working part-time.  (UACL00248).[26]

The Functional Capacity Evaluation (FCE)

On July 22, 1999 Terri Cliett, a registered nurse with a Bachelor of Nursing degree, and Valerie Center, a physical therapist, conducted the FCE of Retha Webb.  (Doc. #17, Vol. 2 of 4, UACL00260-280).  Although the evaluation was scheduled for July 22, 1999 at 8:30 a.m. the GENEX representatives were required to telephone Ms. Webb at 9:10 a.m. when she had not arrived. She told them that she had overslept but that she would be at their location within an hour.  When she arrived 2 and ½ hours later at 11:45 a.m. the examiners' performed musculoskeletal screen and certain basic functioning tests.  During the evaluation Ms. Webb demonstrated verbal and facial "pain behavior" on an infrequent basis.  She "grimaced and sighed and verbalized symptoms of fatigue and widespread muscular and joint pain."  According to the examiners, she was "self-limited" in material handling and endurance tests both because of professed pain and a fear of how she would feel for the next three days.  Objectively the examiners determined that Ms. Webb exhibited fair biomechanics.  They identified a "MILD" (underscore in original) myofascial restriction over the cervical, thoracic and lumbar spines.  They assessed Ms. Webb's testing performance as consistently submaximal in effort.  The recommendation of the examiners was for Ms. Webb to:

> 1.    Return To Work at sedentary-light physical demand level. Recommend beginning part-time (4 hours per day) and progressing to full-time work over a 6 week period.

(UACL00279).

---

[26]    The company also tendered a $20,000 "settlement" offer which Ms. Webb subsequently rejected.  *Id*.

The physical examination took place between 11:45 a.m. and 2:00 p.m.  Ms. Webb was tested for

tolerances for sitting, standing, walking, overhead reach, forward reach, stair climbing, squat, kneel,

balance, gross grasp, fine manipulation and gross manipulation.  Anomalies were noted in walking,

stair climbing, and overhead reach.  No objective limitations were observed but for Ms. Webb's

discontinuing the walking examination at 4 minutes of a 15 minute test complaining of fatigue and

pain in the neck and hip.  In the overhead reach portion of the test, Ms. Webb stopped the test at 3

minutes and 15 seconds of a five minute test complaining of "too much neck pain."  While she

completed the stair climbing test of 20 flights in 6 minutes and 15 seconds, her reciprocal gait was

noted as slow and she exhibited a poor cardiovascular response.  The gross grasp test indicated an

above average result.  The assessment of the examiner was that during the musculoskeletal screen,

Ms. Webb presented minimal objective findings that would have a direct impact on functional

performance.  The examiners concluded that

> Ms. Webb's perception of her disability was significantly higher than
> her demonstrated functional ability.  Despite minimal objective
> findings, she rated herself in the "crippling disability" category of the
> Oswetry Scale.
>
> Additional medical problems may impact on Ms. Webb's functional
> outcome.  As mentioned above, Ms. Webb is currently undergoing
> treatment for an outbreak of skin lesions.  See medical history section
> for other significant past medical problems.
>
> . . .
>
> At the time of referral, restrictions were to tolerance.  Additional
> medical history is significant for allergies, anxiety/depression, genital
> herpes, hepatitis C, rheumatology factor, tonsillectomy, conization of
> the cervix and chronic fatigue syndrome.

(UACL00276).

27

When Ms. Webb called the examiners back the following day as directed, she reported that she felt as if she had been "run over by a bulldozer" stating that that was not unusual when she had exerted herself.  She also reported that

> Actually, finishing the test yesterday gave me a sense of accomplishment and I feel like I've made some steps on my way toward my goal of returning to work part-time in September.  Seeing all I was able to do made me realize all of the past exercises and pushing through the wall of pain may have been worth it.

(UACL00275).

Ms. Webb also telephoned the UNUM representatives on July 23, 1999 stating that she surprised herself at what she was able to accomplish during the testing.  She told the claims intake representative that she hoped to regain lost muscle tone.  Ms. Webb acknowledges she was scheduled to appear for an Independent Medical Examination on August 9, 1999.  She told the representative that she would meet with her attending physician, Dr. Clauw, prior to the examination.  She again said that she hoped to return to work part-time in September 1999.  On August 8, 1999 Dr. Roger Gisolfi reported that Ms. Webb had telephoned to confirm her appointment only to arrive 3 and ½ hours late claiming to have become disorientated.  The physician observed that Ms. Webb had appeared for the FCE at the same location only three weeks earlier.  (UACL00284).

On September 21, 1999 Ms. Webb reported to UNUM that she was scheduled to see an infectious disease specialist for a bacterial infection.  She said that she now suffered a parasitic infection which produced symptoms which were the same as her fibromyalgia.  She stated that she did not feel well enough to return to work as planned.  She provided the names of Dr. Jeffrey Tanner, Dr. Karen Myer, and Dr. Clauw as her current attending physicians.  Ms. Webb told the representative that she would see Dr. Clauw soon.  Once again she was instructed to provide new

medical forms and the physician's progress note.  (UACL00288-289).  On September 13 Dr. Gisolfi reported that at 1:30 p.m. Ms. Webb had canceled a second independent medical examination scheduled for 2:00 p.m.  (UACL00292).  On October 11 the claims representative spoke with Ms. Webb concerning the cancellation of the independent medical examination.  Ms. Webb requested a "small extension" in order the obtain the information from Dr. Clauw and others.  It was explained once again the importance of providing the medical information to the company in large part because the FCE had revealed that she had the ability to work at least part-time and that she had cancelled the independent medical examination on two occasions.  (UACL00293).  An October 20, 1999 deadline was extended to November 20 at Ms. Webb's request.  (UACL00294).  On November 22 Ms. Webb reported that she was in the process of collecting the medical information necessary to substantiate her ongoing disability and requested an extension through November 30, 1999.  By letter dated November 22, UNUM informed Ms. Webb that if the requested information were not received by December 20 the claim file would be closed for the failure the provide substantiation of disability. After receiving no new information UNUM wrote Ms. Webb on December 21, 1999.

> We advised you in [earlier letters] that we needed to receive proof of your disability within thirty days of our request.  Since we have not received the requested information within the specified time period, we are closing your file in accordance [with the provisions of the plan].
>
> If you are still interested in pursuing your claims for disability benefits, please provide us with the necessary information immediately to support your claim.
>
> If you do not agree with our decision, you may have it reviewed. Should you desire a review, you must send a written request, within 90 days of your receipt of this notice.

(UACL00296-97).

2000

On March 20, 2000 Ms. Webb faxed a twenty-five page document to Brendon O'Donnell, the UNUM Disability Benefits Specialist. (Doc. #17, Vol. 2 or 4, UACL00303-327). The first form identified as a UNUM prepared document entitled "Estimated Functional Ability Form" was addressed to Dr. Clauw and identified the patient as Retha Webb. The information on the form indicates that Dr. Clauw concluded that Ms. Webb could occasionally lift 1 to 10 pounds, bend, kneel, climb stairs, reach above her shoulders, and push or pull 5 pounds of occasion. The circled space for the physician's Findings of "Your Clinical Experience" was blank. (UACL00325). The page which bears Dr. Clauw's signature is dated February 22, 2000 and identifies the medical and non-medical factors affecting Ms. Webb's ability to function as "fatigue, pain, cognitive impairment, all [of which] impair Ms. Webb's ability to work." (UACL00323). Dr. Clauw stated her functionality as only two hours of sedentary activity with no light, medium or heavy activity. In answer to the question "at what point in time do you think there will be a significant change in her function ability?," Dr. Clauw wrote "no appreciable improvement predicted." *Id*. Dr. Clauw identified his primary diagnosis as fibromyalgia which included symptoms of extreme fatigue and diffuse soft tissue tenderness. A secondary diagnosis of hepatitis-C. He concluded that "she is unable to maintain any employment." He stated that she should not be required to sit or stand for periods greater than 10 minutes. The treatment period for Ms. Webb was said to be from June 1999 through October 1, 1999. *Id*. Dr. Clauw concluded that the prognosis for recovery was "poor." Additional medical records related to the complaints of hepatitis C, skin lesions and a parasitic infection were also submitted. On September 15, 1999 Ms. Webb had presented to the infectious

disease department complaining of "parasites in stool." She told the intake person that she had seen a mass of parasites and clear organisms in her stool on August 11 although tests revealed no evidence of parasites. Dermatology records also indicated that Ms. Webb had appeared for treatment for skin lesions apparently with Dr. Myers. (UACL00305). On March 29, 2000 UNUM acknowledged receipt of this additional information concluding, however, that "there are no objective findings which support impairment. The claimant has never attended an IME." (UACL00331). On April 3, 2000 the claims representative informed Ms. Webb by telephone that

> Current info does not support disability. No objective medical that was sent.
>
> Clmt [sic] became tearful stating she was disabled and will be evicted because she can't pay the rent. I explained that I would be sending her file to our Quality Review area based on her request. (Sent with the recent medical). She agreed she wants a review of the decision.

(UACL00332).

This decision was confirmed by letter. (UACL00333).[27]

Belino's In-house Medical File Review #1

On May 25, 2000 the Vice-President and Associate Medical Director of UNUM Life Insurance Company completed a medical file review. His conclusion was that

> There is no information here to objectively refute the assessment of the July 1999 FCE that the claimant is capable of sedentary to light physical demand level. The additional information does not support any impairment from her coincidental diagnosis of hepatitis-C.

(UACL00375).

---

[27] As noted above, the matter had been returned to the local office for review. Apparently on March 29, 2000 Belino, the Vice-President/M.D., reviewed the documents and concluded that there was insufficient objective data supporting impairment but also recommended additional current medical data be obtained. The file was returned to the local office to comply with Belino's March 29, 2000 request for a full medical review and if the medical records did not support a finding of diability, outline the applicable provisions of the policy and evidence supporting the decision preserving Ms. Webb's right to appeal. (UACL00338).

Belino purportedly reviewed the laboratory data and Dr. Clauw's February 22, 2000 treatment summary.  On May 26 the claims representative telephoned Ms. Webb to inform her that the decision to deny her claim had been "upheld."  The notes from that conversation indicate that

> I explained to her that there is no add'l medical information to refute the 7/99 FCE which found she had a minimum of part-time sed [sic] to light work capacity, and as her own occupation of admin. asst. can be performed, she is not eligible for bens.

> She was upset with the decision, asked if the psych/cognitive issues were taken into consideration, stating "who would employ me?"  I explained that it was noted that she stated depression throughout the file, and that there is a 24 month limitation for M/N conditions–as we have paid bens. for 44 months, she is not eligible for further bens.

> She asked if the medical information was taken into consideration, stating that she has IBS [Irritable Bowel Syndrome], too–I explained that we requested and evaluated all medical information from her AP [attending physician], who she stated was the doctor treating her, and based the evaluation on this.

(UACL00379).

On June 8 a UNUM representative telephoned Ms. Webb to remind her that she would need to send an appeal letter if she sought an additional review.  (UACL00387).  On August 28 Ms. Webb called and was advised to fax a letter of appeal and state in the letter that additional information would be provided later.  On August 31, UNUM called Ms. Webb to tell her that it had not received an appeal and that she needed to act quickly.  By letter dated September 7, 2000 Ms. Webb requested a review of the denial of Long Term Benefits retroactive to December 1999.  The letter referred to an August 1, 2000 appointment with Dr. Mohan, Dr. Clauw's replacement while he was on sabbatical and an increase in her anti-depressant medication "with the goal of controlling such fibromyalgia symptoms as Irritable Bowel Syndrome, sleep disorder, chronic pain, as well as accompanying depression (a recognized symptom of fibromyalgia)."  (Doc. #17, Vol. 2 or 4,

UACL00401).  By a separate September letter, more than 12 typewritten pages long, Ms. Webb

recounted her medical history expressly observing that her depression was a symptom of her primary

diagnosis of fibromyalgia.  (Doc. #17, Vo. 2 of 4, UACL00407).  On October 16, 2005, Dr. Clauw,

Dr. Mohan and R.N. Kim Gosner signed the letter referred to above in which they continue to

support the disability of Ms. Webb for the diagnosis of fibromyalgia.  (UACL00444).

UNUM's In-House Medical Review–#2 Denial of Her Claim

On December 21, 2000 Belino, the Vice-President/M.D., again undertook a review of the

data provided by Ms. Webb, Dr. Clauw and the other physicians providing services.  The report

concluded that

1. The diagnosis of fibromyalgia was apparently made on the basis of plaintiff's complaints of multiple myalgias and arthralgias, which were not supported by diagnostic laboratory tests.  (Some early inflammatory changes that were non-specific were ultimately attributed to her since treated chronic active hepatitis-C)  The diagnosis, as pointed out, was made at least as early as 1990 and symptomology existed at least as far back as 1987.

2. The new information provided does not change the prior determination in OSP review dated 5/25/00.

3. There is no evidence that the IBS would have precluded the plaintiff from working as of 12/1/99.  The records in the file do not document significant impairment from that condition.

4. The claimant has received erratic care.  It appears that this maybe due to her choice and her not attending appointments.  Another possibility is that we do not have all of the medical records, however, the latter seems unlikely.

5. The claimant has apparently not been receiving any psychotherapy or psychiatric care for her depression and other potential psychiatric problems.  At this time, it is unclear that she has received any treatment for the depression except for

the use of anti-depressants which have a dual role in the "treatment of the fibromyalgia."

6.   It appears unlikely that Doc-to-Doc with Dr. Clauw would clarify the claimant's work capacity as 12/1/99. In review the records there do not appear to be a visit from the office around that time. (In fact, the records do not support that she has been seen on a regular basis in that office. In reverse chronological order visits being 8/00, 2/00, stools O&P in 12/99, infectious disease work up in 9/99, ambulatory care notes from George Washington University Medical Center dated 6/99, 8/99 and laboratory tests in 8/99.) Therefore it is extremely unlikely that Dr. Clauw has any objective information about that time period. The other information does not support the claimant's inability to function because of degree of bowel symptomology.

(UACL00472-473).

Belino recites that he reviewed the progress notes from Dr. Sliwinski, Dr. Clauw, Dr. Ken Johnston, and Meredith Cary.[28]

_____On January 4, 2001 UNUM notified Ms. Webb that her Long Term Disability Benefits claim had been denied because she was capable of part-time employment, that she had failed to provide proof that she was under the regular care of a physician, that her self-reported mental condition had resulted in a payment of benefits for a term of twenty-four months, the maximum under the policy, that FCE of July 1999 objectively confirmed her ability to work part-time and that the medical records, including items like physician's notes, did not support her claim of disability. The letter also referred to the October 16, 2000 letter from Dr. Clauw concluding that in spite of the letter Belino had concluded that the May 25, 2000 evaluation was unaffected.[29]

---

[28]   Belino observed that on at least two occasions Ms. Webb's medical records indicate the possibility of "psychosis." (UACL00476).

[29]   Clauw made clear on more than one occasion that fibromyalgia was not diagnosed based on tests which revealed its presence, but, rather, by ruling out other causes for the reported pain.

APPLICABLE LAW

ERISA provides that a plan participant or beneficiary may bring a civil action in federal court to "recover benefits due to him under the terms of his plan."  ERISA, § 1132(a)(1)(B).  The statute, however, provides no standard within the text for reviewing the decisions of plan administrators or fiduciaries.  *Firestone Tire & Rubber Company v. Bruch*, 489 U.S. 101, 109, 105 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Shaw v. Connecticut General Life Insurance Co.*, 353 F.3d 1276, 1282 (11th Cir. 2003); *Marecek v. Bell-South Telecommunications, Inc.*, 39 F.3d 702, 705 (11th Cir. 1995).  In general, a court reviews an ERISA plan for denial of benefits under § 502(a)(1)(B) *de novo* unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the court reviews whether the decision maker acted in an arbitrary or capricious manner.  *Firestone Tire & Rubber Company*, 489 U.S. at 115, 105 S.Ct. at 962.  Consistent with the instructions of *Firestone* the Eleventh Circuit has adopted three distinct standards of review under § 502(a)(1)(B): (1) *de novo*, applicable where the plan administrator has no discretion, (2) arbitrary and capricious (abuse of discretion), where the plan grants the discretion to the administrator, and (3) heightened arbitrary and capricious, where the plan grants discretion but the administrator is acting under a conflict of interest.  *Paramore v. Delta Airlines, Inc.*, 129 F.3d 1446, 1449 (11th Cir. 1997).[30] In specifically addressing the effect of a conflict of interest on a court's review of an administrator's decision, the Eleventh Circuit noted that the trust nature of an employee benefit plan is fundamental to ERISA, and the administrator, as a fiduciary, is entitled to exercise a great deal of discretion.  *Brown v. Blue Cross and Blue Shield*, 898

---

[30]   The third standard of review is derived from *Firestone*, on which the Supreme Court noted that a conflict of interest noted that a conflict of interest is a factor to be weighed in determining whether there has been an abuse of discretion.  489 U.S. at 115, 109 S.Ct. 948.

F.2d 1556, 1561 (11th Cir. 1990).  However, where a conflict of interest exists, the trust aspects of

an employee benefit plan is minimized.  *Id*.  Accordingly, where the administrator of an ERISA plan

has discretionary authority to determine eligibility for full benefits and acts under a conflict of

interest, such a determination involving plan interpretations is not entitled to as much deference.  *Id*.

at 1561.

When the Eleventh Circuit concluded that a conflict of interest entitles the administrator's

decision to less deference the court then set out to develop a coherent method of integrating factors

such as self-interest into a legal standard for reviewing benefit determinations.  *Id*.  The court

rejected the idea of simply looking at the record with "a somewhat jaundice eye" in favor of a step-

by-step burdenshifting matrix for evaluating the ERISA's administrative decisions.  *Id*.; see also

*HCA Health Services of Georgia v. Employer Health Insurance Co.,* 240 F.3d 982, 993 (11th Cir.

2001) ("At each step of this analysis, the court makes a determination that results either in the

progression to the next step or the end of the inquiry.")[31/] The multi-step approach to assessment of

the propriety of the denial of plan benefits may require a court to consider different information and

evidence at different steps.   Initially, the court must determine whether the plan grants the

administrator the requisite discretion.  If no discretion is granted, the decision is reviewed *de novo*.

If the administrator is granted discretion, then at a minimum the court applies the arbitrary and

capricious standard.  Whether the court ends up applying simply an arbitrary and capricious review

or the heightened arbitrary or capricious review will depend on how far the multi-step analysis

progresses.  It is significant that the Eleventh Circuit's burden-shifting approach is applicable to an

---

[31/]  This burdenshifting approach, however,  has been criticized or rejected in other circuits.  See *Pinto v. Reliance*,
214 F.3d 377, 391 (4th Cir. 2000); *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287, 296 (5th Cir.
1999); *Armstrong v. AETNA Life Insurance Co.*, 128 F.3d 1263, 1265 (11th Cir. 1997); *Chambers v. Family
Health Plan Corp.*, 100 F.3d 818 (10th Cir. 1996); *Doe v. Group Hospitalization & Medical Services*, 3 F.3d
80, 87 (4th Cir. 1993); and *Miller v. Metropolitan Life Insurance Co.*, 925 F.2d 979, 984 (6th Cir. 1991).

administrator's factual determinations as well as the interpretation of the plan's provisions. *Shaw v. Connecticut General Life* Insurance, 353 F.3d 1276, 1285 (11th Cir. 2003) ("Our court has already declined to draw a distinction between law and fact in choosing the standard of review for denial of ERISA benefits."); *Torres v. Pittston Company*, 336 F.3d 1324 (11th Cir. 2003). *Levinson v. Reliance Standard Ins. Co*., 245 F.3d 1321 (11th Cir. 2001) but see *Williams v. BellSouth*, 373 F.3d at 1138-39 (In both *Shaw* and *Levinson,* two factual determination cases, we did not say whether *Brown's* heightened arbitrary and capricious burden-shifting approach should be applied to factual determination cases.")

After determining that the plan grants the administrator discretion, the court first makes the *de novo* determination whether the decision to deny benefits was "wrong." *HCA Health Services*, 240 F.3d at 993.[32/]   If the court agrees with the plan administrator's decisions; that is, that the decision was "right," the court's inquiry ends and the administrator's decision is affirmed. However, if the court disagrees with the administrator's decision; i.e., that it was "wrong," then the court's second step is to decide whether reasonable grounds exist in the record to support the defendant's interpretation of the plan or its decision. If reasonable grounds do not exist for the administrator's decision then the decision is arbitrary and capricious and the administrator's decisions must be reversed. *Id*. In pre-*Brown v. Blue Cross and Blue Shield* cases, if reasonable grounds did in fact exist in the record to support the administrator's decision, then the court simply deferred to the administrator's discretion and the denial of benefits was upheld. In other words, under a pure arbitrary and capricious standard of review, the court's determination of whether the ERISA plan

---

[32/]   "Wrong" is the label used by the Eleventh Circuit to describe the conclusion a court reaches when, after reviewing the plan documents and the administrative record, the court disagrees with the plan administrator's decisions. *HCA, supra*, 240 F.3d at 993, n.23; *Yochum v. Barnett Banks, Inc.*, 234 F.3d 541 (11th Cir. 2000).

participant is entitled to benefits hinges solely on whether the administrator's wrong decision is nevertheless reasonably supported by the record.

In the Eleventh Circuit, after *Brown* and its progeny, a reviewing court must continue its inquiry after determining that the administrator's decision is wrong, but reasonable. Specifically, the court must determine whether the administrator operated under a conflict of interest. *Id*. If no conflict of interest exists, then a pure arbitrary and capricious standard of review applies and a wrong, but reasonable, interpretation will be upheld. If a conflict of interest does exist, then the Eleventh Circuit shifts the burden to the claims administrator to prove that its interpretation of the plan is not tainted by its self-interest. *Id*. at 995. A wrong, but apparently reasonable interpretation, is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the beneficiary. *Brown, supra,* 898 F.2d at 1566, 1567.

In *Williams v. BellSouth Telecommunications*, the Eleventh Circuit discussed earlier decisions purportedly applying the heightened arbitrary, capricious standard in the context of factual challenges to an administrator's decision to deny benefits. The court observed that it is difficult to formulate a standard of scrutiny that requires an administrator to demonstrate something more than the "reasonableness" of it is factual determination, but less that the correctness of it. (i.e., that it is not "wrong" before it may prevail.) See *Williams,* 373 F.3d at 1138 ("We described 'heightened arbitrary and capricious review, *supra*, as somewhere between the *de novo* and 'near' arbitrary and capricious standards. But where is that 'somewhere'?") At least in the factual context the Eleventh Circuit observed in *Brown* that

> Even a self-interested fiduciary is entitled to choose an apparently
> more reliable source of information when sources conflict.

*Brown*, 898 F.2d at 1568.

At least one district court has concluded that the evidentiary examination suggested in *Brown* results in a comparative objective analysis with respect to the reliability of various sources of evidence as the evidence from these sources was before the administrator at the time the disputed decision was made as the focal point of the court's review.  In *Wise v. Hartford Life and Accident Insurance Co*., 360 F. Supp. 2d. 1310, 1322 (N.D. Ga. 2005), Judge Storey concluded that the appropriate review "places upon the conflicted administrator a greater burden than merely showing that its decision was not without *some* reasonable basis, but at the same time does not demand that the court actually agree with the decision before it is given deference."  (Emphasis in original).  In Wise the court concluded that "... a conflicted plan administrator may carry its burden in a suit challenging a 'wrong but reasonable' factual determination if it can demonstrate that the opinions and evidence it relied on denying the plaintiff's claims were, viewed from both a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and the evidence then before it."  *Wise*, 360 F. Supp. 2d at 1323 [citing similar factual analysis in *Barchus v. Hartford Life and Accidental Insurance Company*, 320 F. Supp. 2d 1266, 1290 (M.D. Fla. 2004) and *Fick v. Metropolitan Life Insurance Co*., 347 F. Supp. 2d 1271 (S.D. Fla. 2004)].  If an administrator can demonstrate that it elected to follow what is reasonably perceived as equally or objectively more reliable data the insurer substantially ameliorates that fear that its decision was motivated by self-interest rather than a good faith effort to exercise its discretion to interpret and apply the plan.  *Id.*[33]

---

[33]    The evidence is also assessed based upon the materials available to the administrator at the time the decision was made.  A social security finding of disability may be relevant to assessing the motive of the administrator but is not determinative of the participant's medical condition at the time of the decision.  *Wilcox v. Standard Insurance Company*, 340 F. Supp. 2d 1266, 1281 (N.D. Ala. 2004), *citing Cirwan v. Marriot Corp*., 10 F.3d 784 (11th Cir. 1994) and *Paramore v. Delta Airlines*, 129 F.3d at 1452 n.5.

Legal Evidentiary Principles–Factual Issues in ERISA

Attending Physician's Opinion

The defendant correctly notes that Dr. Clauw's opinion of Ms. Webb's condition is not entitled to any special weight merely because he is her attending physician.  In *Black & Decker Disability Plan v. Nord*, 538 U.S. 222, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) the Court held that in ERISA cases, a district court has "... no warrant to require administrators to automatically accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with the treating physician's evaluation."  *Id*. at 834, 123 S.Ct. 1965. See also *Richards v. Hartford Life and Accident Insurance Co.*, 356 F. Supp. 2d 1278, 1286 (S.D. Fla. 2004).  *Nord*, however, does not authorize a plan administrator to arbitrarily reject the attending physician's opinion.  When, as here, the plan administrator operates under an apparent conflict of interest, the opinion of the attending physician may constitute evidence of greater probative value in the assessment of the exercise of discretion than the evidence relied upon by the administrator.  In such  a case the weight given to the attending physician's opinion is not greater merely because he is the attending physician, but because his evidence may be better.  Qualitatively, for example, it is relevant that Dr. Clauw is a physician based at a teaching hospital with a specialty in rheumatology who examined and treated Ms. Webb on several occasions.  Dr. Belino is an in-house vice-president of an insurance company and has not been identified in any paper as a physician with specialized training in the treatment of rheumatoid disorders or fibromyalgia.  It is also undisputed that Belino never observed or examined Retha Webb.[34]

---

[34]   For reasons more fully set forth below it is also relevant of Vice-President/M.D. Belino has not demonstrated expertise in psychiatry or mental disorders.

Fibromyalgia and Objective Medical Data

As Chief Judge Posner of the Seventh Circuit Court of Appeals noted in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996)

> [F]ibromyalgia, also known as fibrositis–is a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. *See Frederick Wolfe, et al.* "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multi-Center Criteria Committee," 33 Arthritis and Rheumatism, 160 (1990); Lawrence M. Tierney, Jr., Stephen J. McPhee & Maxine A. Papadakis, Current Medical Diagnosis & Treatment 1995, 708-09 (1995). Its cause or causes are unknown. There is no cure and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principle symptoms are "pain all over," fatigue, disturbed sleep, stiffness and–the only symptom that discriminates between it and other diseases of rheumatic character–multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch. All of these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations, that if palpated will cause the patient who really has fibromyalgia to flinch.... Some people may have such a severe case of fibromyalgia as to be totally disabled from working, Michael Doherty & Adrian Jones, "Fibromyalgia Syndrome (ABC of Rheumatoidology) 310 British Med. J. 386 (1995); *Trustan v. Secretary of Health & Human Services*, 854 F.2d 815, 818 (6th Cir. 1988) (per curium) but most do not and the question is whether [the plaintiff] is one of the minority.

*Sarchet v. Chater*, 78 F.3d at 306-307.

As a consequence, in spite of its elusive nature, the presence of fibromyalgia can be objectively verified in some fashion. As noted in *Sarchet*, the locations of identifiable tender areas or "trigger points" are well defined and will cause pain upon palpation. Objective clinical support for a diagnosis of fibromyalgia may also be present if injections of pain medication to the trigger points had been prescribed. See e.g. *Kelly v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). See also *Ecklund*

*v. Continental Casualty Company*, 414 F. Supp. 2d 1353 (N.D. Ala. 2005) (observing that a physical examination of "trigger points" can objectively establish evidence of fibromyalgia).

Evidence of a Conflict

As noted above, when the administrator making benefits decisions is also the insurance company responsible for paying the claims, which is the present situation, the heightened arbitrary and capricious standard of review is proper due to the possible conflict of interest. *Brown*, 898 F.2d at 1563-64. *See also Williams*, 373 F.3d at 1134-35 (citing *Firestone Tire & Rubber Co. v. Bruch*, *supra*).

UNUM's Termination of Benefits May 2000 - December 2000

It is undisputed that in December 1999 UNUM suspended Ms. Webb's disability payments in accord with the plan provisions because of a persistent failure to provide required medical evidence upon which the administrator could conduct an evaluation of her continued eligibility for payments. It is also true that this decision was "upheld" in April 2000. The termination of benefits or the findings and conclusion of the administrator that Ms. Webb was ineligible for benefits is bottomed on Belino's May 25, 2000 medical records review. In other words, no matter how justified the December 1999 action may have been that is not the decision under review. The suspension of benefits is largely irrelevant to the fundamental question of the administrator's conclusion that Ms. Webb was ineligible for continued disability payments. In the May 30, 2000 letter in which UNUM informed Ms. Webb that "... you are not eligible for benefits, ..." (doc. #17, Vol. 2 of 4, UACL00385), the company acknowledged that the December 17, 1999 "suspension" was

ameliorated with the submission of additional medical evidence.[35]  The reasons given for the

determination Ms. Webb was not eligible for benefits was that the FCE of July 22, 1999 "...

indicate[d] that [she] [had] a minimum of part-time sedentary/light work capacity.  As [her] regular

occupation of administrative assistant [fell] into the sedentary/light category, [she was ] no longer

eligible for benefits according to the policy provisions."  *Id*.  The notice of termination also stated

that

> During our telephone conversation on 5/26/2000 you question
> whether your psychiatric condition was taken into consideration in
> making the determination of your disability status.  We note that you
> have indicated to be suffering from depression from the inception of
> your claim.  Please be advised of the following provisions of your
> policy:
>
> > "*WHAT DISABILITIES HAVE A LIMITED A TIME PAY
> > PERIOD UNDER YOUR PLAN?*
> >
> > *Disabilities due to mental illness have a limited pay period up
> > to twenty-four months.*
> >
> > *UNUM will continue to send you payments beyond the
> > twenty-four month period if you can meet one or both of these
> > conditions:*
> >
> > *1.     If you are confined to a hospital or institution at the
> >         end of the twenty-four month period, UNUM will
> >         continue to send you payments during your
> >         confinement.*
> >
> >         *If you are disabled when you are discharged, UNUM
> >         will send you payments for a recovery period of up to
> >         ninety days.*
> >
> >         *If you become re-confined at any time during the
> >         recovery period and remain confined for at least*

---

[35]     "As you have subsequently provided us with additional office treatment notes and lab results, these have been
reviewed by our medical department.  There is no objective data found to refute the results of the 7/22/99
Functional Capacities Evaluation, which indicated you have work capacity."  (*Id*., UACL00384).

> 2. *fourteen days in a row, UNUM will send payments during that additional confinement and for one additional recovery period up to ninety or more days.*
>
> 2. *In addition to item 1., if, after the 24 months period for which you have received payments, you continue to be disabled and subsequently become confined to a hospital institution for at least fourteen days in a row, UNUM will send payments during the length of re-confinement.*
>
> *UNUM will not pay beyond the limited period as indicated above, or the maximum period of payment, which ever occurs first."*
>
> As you received a total of forty-four months of benefits from UNUM, you have been in excess of the maximum payable for a psychiatric condition.

(*Id*. at UACL00383).

In short, despite the "suspension" of disability payments in December 1999 the two reasons given for terminating Ms. Webb's benefits were (1) that she was capable of part-time employment as of July 22, 1999 and (2) her "mental illness" disability payments had exceeded the maximum allowable term of twenty four months.

## *De Novo* Review of the Decision

The first step under the heightened arbitrary and capricious standard the court must make a *de novo* determination of whether the administrator's decision is "wrong." *Williams*, 373 F.3d at 1138. If the decision is not wrong then the court's inquiry ends there and the decision is affirmed. Absent any deference to the plan administrator, a decision is "wrong" if the court merely disagrees with the conclusion.[36/] If the administrator's decision is *de novo* wrong, then a court must determine

---

[36/]    In *Brown*, the Eleventh Circuit stated that "the fiduciary's interpretation first must be 'wrong.'" 898 F.2d at 1566 n.12. From that point forward the Eleventh Circuit used the word "wrong" to indicate a *de novo* disagreement. See *Lee v. Blue Cross Blue Shield*, 10 F.3d 1547, 1551 n.3 (11th Cir. 1994) (Stating *"Brown*

whether the administrator was vested with discretion in reviewing the plans and, if not, the judicial inquiry ends and the decision is due to be reversed.  For the purposes of this order and the analytical framework, the current circumstances dictate, the court is persuaded that the administrator's decision of May 2000 and December 2000 that Ms. Webb was not eligible for disability payment benefits is wrong.

Viewing the facts in the light most favorable to Ms. Webb, UNUM's conflating of the suspension of her benefits in December 1999 with the ultimate denial of her benefits in May 2000 requires the court to consider the plaintiff's own reasonable interpretation of the facts and the plan provisions.  See *Watts v. BellSouth Telecommunications, Inc.*, 316 F.3d 1203, 1207-1208 (11th Cir. 2003)("The reasonableness of [a party's interpretation] must be judged from the prospective of the average plan participant). (*Citing*  29 U.S.C. § 1022(a))

Plan Discretion

_____As observed earlier the plan defined UNUM's authority to determine eligibility for benefits and to interpret its terms and provisions to be

> When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy.

(Doc.. #17, Vol. 2 of 4, UACL00583; CERTIFICATE SECTION 8/1/1995).

After determining that the plan grants the administrator discretion and on a *de novo* review the court disagrees with the decision.

---

instructs us to review *de novo* whether the insurer's interpretation of the plan is wrong.") *See also Florence Nightingale Nursing Services, Inc. v. Blue Cross/Blue Shield*, 41 F.3d 1576, 1581 (11th Cir. 1995).

<u>Arbitrary and Capricious</u>

Having concluded that the plan grants an unbiased administrator with discretion to interpret plan terms and define eligibility, the next step is to decide whether grounds exist in the record to support the defendant's interpretation of the plan or decision.  If reasonable grounds do not exist for the administrator's decision, the decision is arbitrary and capricious and the decision must be reversed.  Before *Brown*, if reasonable grounds in fact existed in the record which would support an administrator's decision, the court simply deferred in all cases to the exercise of that discretion and affirmed the denial of benefits.  There is evidence in the administrative record that (1) the July 1999 FCE indicated that Ms. Webb was physically capable of part-time employment, (2) that her attending physician in 1999 had indicated that she was at some point in the future capable of part-time employment, (3) the plaintiff herself had indicated a desire and ability to return to work on at least a part-time basis, (4) that the plan provisions expressly provide for a termination of benefits of a plan participant capable of part-time work who refuses to do so,[37/] and (5) the medical records provided to UNUM lacked diagnostic and objectively clear analytical evidence of continued disability.  Applying a purely arbitrary and capricious standard, the court concludes that the administrator's decision was wrong but reasonable.

<u>Heightened Arbitrary and Capricious</u>

UNUM argued that it had no conflict of interest or that its decision was not motivated by the conflict because the plan has an obligation to (1) enforce the "rules" equally among plan participants and (2) to ensure that the plaintiff was not paid when she could return to work but chose not to, "... while denying benefits to other participants who are similarly situated, would constitute unequal

---

[37/]   The plan also provided for some level of continued benefit to be provided to a beneficiary assuming part-time employment.

treatment among participants." The defendant argues that its decisions provided "predictability" to plan beneficiaries. (Doc. #18, pp.24-25). There is indeed some authority for the proposition that if an administrator can demonstrate a routine practice or give other plausible justifications, such as benefitting the interests of other beneficiaries, judicial deference to it may be granted since "[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interest of the participants and beneficiaries. *Brown*, 898 F.2d 1568, (cited in *Williams v. BellSouth Telecommunication*, 373 F.3d at 1138). The burden however does not necessary shift to Ms. Webb to come forward with evidence that the decision was in fact motivated by a conflict of interest but, rather, in light of a plausible explanation for the administrator's decision in selecting among alternatives the court basis for such a decision with some considerable deference to the exercise of discretion but less than would be accorded an administrator without a conflict. As observed earlier even a conflicted plan administrator may carry a burden in a suit challenging a "wrong but reasonable" factual determination if it can be demonstrated that the opinions and evidence it relied on in denying the plaintiff's claim viewed from a qualitative and quantitative perspective is at least as objectively reliable as countervailing opinions and the evidence then before it. In May of 2000 Belino credited the July 1999 FCE in concluding that

> The claimant has demonstrated a sedentary-light capacity on FCE while consistently performing submaximally. This in a setting of having repeatedly not attending [sic] the FCE and having not cooperated with the previous recommended IME. Since she has supplied the information from her treating physician, and since it does not document any objective information to refute the FCE, there is no need for an IME at this time in my opinion.
>
> Of interest is that the claimant displays some behavior, which may be delusional. This is demonstrated by her insistence on the presence in

> parasites when none have been found on testing, and more strongly suggested by her feeling that those parasites were in some way affecting the batteries and lights in her home.  This makes her description of her symptoms more suspect and forces a greater reliance on objectificable [sic] data to determine impairment.

(Doc. #17, Vol. 2 of 4, UACL00373).

Clearly Belino reached two conclusions:  (1) the "objective" data indicated that Ms. Webb was capable of performing part-time work because her fibromyalgia and related symptoms did not prevent her from doing so, and (2) that she was "delusional."[38/]

In his second review of the medical data in December of 2000 Vice-President Belino undertook to answer six questions put to him by the claims representative.

1.   On what basis was the diagnosis of fibromyalgia made?

2.   Does the new information change the OSP conclusion that the claimant had part-time sedentary capacity as per the 7/99 MCE?

3.   Is there evidence that the IBS might have precluded the claimant from working as of 12/1/99?

4.   Does the information support that the claimant has been receiving regular care?

5.   Does the information support that the claimant has been receiving appropriate care for her diagnosis of depression?

6.   Please comment on whether a Doc-to-Dr. Clauw would help clarify the claimant's work capacity as of 12/1/99.

(Doc. #17, Vol. 2 of 4, UACL00477).

---

[38/]   This latter conclusion is predicated solely upon a review of anecdotal reports.  Belino does not suggest that he ever saw Retha Webb, that he ever diagnosed Retha Webb, or that he has ever diagnosed a patient with a mental condition.  Despite the absolute absence of any objective data upon which to reach his conclusion that Ms. Webb was delusional or that her incapacity arose from her mental condition, Belino nonetheless opined both that she was and that caused her incapacity.  There is no rational basis for this conclusion.

Belino examined medical records beginning with those reviewed by Dr. Sliwinski in 1990 from earlier physician visits in 1987 through the November 16, 2000 submissions including the letter from Dr. Clauw, Dr. Mohan and Nurse Groner.  *Id.*  He noted that the attending physician had defined Ms. Webb's medical condition as (1) fibromyalgia, (2) depression, (3) extreme fatigue, generalized myalgias and arthralgais,[39] and (4) hepatitis-C status post-treatment with Interferon. Belino observed that Ms. Webb had visited the physician on August 1, 2000 complaining of IBS problems, indicating that she had not felt as depressed because of medication.  The physician's findings at that time were related only to edema.  The only other evidence of a physician visit contained in the information provided to Belino was a February 2000 notation that Ms. Webb had complained of lower abdominal cramping an diarrhea.  The records from this visit referred to testing conducted by an infectious disease specialist which had on three occasions revealed no parasites were present in her stool or body.[40]  The notes indicated that a psychiatric recommendation would be obtained.  There is no record of such an examination for reasons discussed elsewhere in this order. Belino specifically noted that Dr. Clauw's October 2000 letter did not take into account the objective findings of the FCE nor his own conclusion earlier in 2000 that Ms. Webb would be able to return to work part-time.  Belino, in addition to noting the absence of objective evidence in support of the continued disability predicated upon the fibromyalgia designation, stated that

> It would seem that the claimant's delusional activity raises questions with all her symptomology since clearly fibromyalgia, as pointed out by Dr. Clauw, is not confirmable with laboratory or x-ray diagnostics. Instead, it is a condition that is self-reported by symptomology.  The fact that this claimant is delusional about the presence of parasites

---

[39]   One medical dictionary defines "arthralgais" as "pain in a joint."  *Dorland's Illustrated Medical Dictionary*, 140 (28th Ed. 1994).

[40]   These notes also were referred to in the May 2000 summary.

and their ability to affect inanimate objects such as the energy level of light bulbs and batteries seriously raises the question of her ability report [sic] her somatic symptoms in a valid manner.  This raises a serious problem with the ongoing diagnosis of fibromyalgia.  Nothing objective is presented by Dr. Clauw and his associates to counter the statements that were made in 7/99 Functional Capacity Evaluation where the claimant is said to have a sedentary capacity on a part-time level.

It is conceivable that there is considerable psychiatric pathology ongoing in this claimant; however, at this time, it is not documented as being treated by any mental health provider.  The claimant's difficulty with cognitive ability appears to be refuted by her very detailed sixteen-page letter of appeal dealing with many of the points of the original denial letter.

**Conclusions:**

1.  The diagnosis of fibromyalgia was apparently made on the basis of claimant's complaints of multiple myalgias and arthralgias, which were not supported by diagnostic laboratory tests.  (Some early inflammatory changes that were non-specific were ultimately attributed to her since treated chronic active hepatitis-C.)  The diagnosis, as pointed out, was made at least as early as 1990 and the symptomology existed at least as far back as 1987.

2.  The new information provided does not change the prior determination in the OSP review dated 5/25/00.

3.  There is no evidence that the IBS (Irritable Bowel Syndrome) would have precluded the claimant from working as 12/1/99.  The records in the file do not document significant impairment from that condition.

4.  The claimant has received erratic care.  It appears that this may be due to her choice and her not attending appointments.  Another possibility is that we do not have all of the medical records, however, the latter seems unlikely.

5.  The claimant has apparently not been receiving any psychotherapy or psychiatric care for her depression and other potential psychiatric problems.  At this time, it is unclear that she has received any treatment for depression except for the

use of anti-depressants, which have a dual role in the "treatment of the fibromyalgia."

6.    It appears unlikely that a Doc-to-Doc call with Dr. Clauw would clarify the claimant's work capacity as of 12/1/99. In reviewing the records, there does not appear to be a visit from that office around that time. (In fact, the records do not support that she has been seen on a regular basis in that office. In reverse chronological order visits being 8/00, 2/00, stools for O&P in 12/99, infectious disease work-up in 9/99, ambulatory care notes from George Washington University Medical Center dated 6/99, 8/99 and laboratory tests in 8/99.) Therefore it is extremely unlikely that Dr. Clauw has any objective information about that time. The other information does not support the claimant's inability to function because of the degree of bowel symptomology.

*Id.*, at UCAL00472-00473.

While UNUM at one point sought an independent physical evaluation of Ms. Webb, Dr. Belino specifically concluded in December 2000 that it was not necessary to do so. UNUM had also at one point attempted a psychiatric evaluation and Belino specifically noted that there was no information related to psychiatric treatment in the file. Under the terms of the plan the administrator has the right to require that objective medical findings be tendered in support of the claim of continued disability. As noted elsewhere, conventional laboratory tests may not reveal the presence of fibromyalgia, however, the tests can be useful in determining whether other causes are possible. Fibromyalgia itself does lend itself to certain diagnostic procedures including the palpation of the pressure points. Dr. Sliwinski specifically observed in 1997 and 1998 that Ms. Webb demonstrated less actual response to such palpation after receiving treatment and medicine than she had earlier. He also appeared to question her verbal reaction in light of her actual physical responses. Dr. Clauw's examination record did not include evidence of any such procedure and, if such a procedure was performed, no results were recorded.

Belino's first conclusion that Ms. Webb's mental health benefits were exhausted, is not supported by the record.  Belino's "diagnosis" establishes no beginning date for the illness he ascribes to Ms. Webb nor indeed an ending date.  In order to conclude that the twenty-four month period of mental health benefits was in some fashion incorporated into the forty-four months she received payments for her fibromyalgia condition, such dates are of paramount importance.  His conclusion is fundamentally wrong.  It is also true however that Ms. Webb was not treated during that period for such a condition and provided no evidence of a discrete psychological basis for her inability to work.  Whether she could have done so or should have done so is not at issue.  While Belino's conclusion of psychosis is unsupported, the depression associated with fibromyalgia was treated and did not constitute a separate and independent psychological disability which would give rise to benefits under the plan.  Ms. Webb's episodic adherence to her treatment regime does not provide objective data that either fibromyalgia or the depression arising from fibromyalgia prevented her from engaging in part-time employment as the objective data had revealed.  The plaintiff, her doctor and the independent agents performing the FCE all concluded that Ms. Webb could work part time.  There is no objective evidence to the contrary.  While Clauw later asserted in his letter that he believed Ms. Webb to be disabled because of her fibromyalgia he provided no data which would serve to contradict his own earlier observation that Ms. Webb was capable of part-time work.  Ms. Webb never provided the evidence upon which it might be seen that Belino's assessment was unreasonable.

Conclusion

After consideration of the evidence, the administrative record and under a heightened arbitrary and capricious standard of review the court finds that

(1)     the administrator's decision to deny benefits was wrong,

(2)     the plan administrator had discretion to interpret the provisions of the plan and to determine eligibility for benefits,

(3)     the administrator had a conflict of interest, and

(4)     there is no evidence that the conflict of interest motivated the administrator's decision in that the objective evidence available to UNUM on the core, fundamental question at issue was at least as good as the evidence suggesting a different result.

Therefore under even the heightened arbitrary and capricious standard, the administrator's decision was wrong, but reasonable.  Judgment will enter for the defendant.

As to the foregoing it is SO ORDERED this the 26th day of April, 2006.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE